## McFarland vs. Carr and others.

Where W., who was the agent of M., the lender, but without any *general* authority to make loans for him, made a loan of money for him to C., secured by a note and mortgage, reserving the highest legal rate of interest, and in addition thereto charged C., the borrower, a *bonus* of $50, for his services in obtaining the same, and the loan was made under directions from the lender, the terms of which were not shown, and the evidence was such as to authorize the presumption that the lender knew of the arrangement by which the $50 *bonus* was to be received by his agent, who acted exclusively as the agent of the lender. *Held,* that the lender was chargeable with participation in the unlawful profit, and the note and mortgage given to secure the loan, were usurious and void. The real question in such case is, whether W., the agent, while negotiating the loan and exacting the *bonus* for making it, was acting as the agent of the lender, and within the scope of his authority in making it as he did, and in the absence of any evidence to the contrary, it must be presumed that he made it according to the directions given him by the lender.

Where in such case, W., the agent, paid over the whole sum named in the note and mortgage to the borrower, who immediately handed back to him the $50 *bonus,* it was held that this was a mere shift and device, and the real character of the transaction was not thereby changed.

A person may act as a broker in behalf of the borrower, and charge a commission for his services in negotiating a loan for him, and if this is done without the knowledge of the lender, or any participation on his part in the profit, the transaction is not usurious.

The agent of the lender may be employed by and receive compensation from the borrower, for services actually performed by him for the borrower, in effecting a loan, without rendering it usurious.

APPEAL from the Circuit Court for *Lafayette* County.

Action for the foreclosure of a mortgage, dated October 8, 1859, for $400, accompanied by a promissory note for that sum, payable one year after date, with interest at twelve per cent. per annum until paid, executed by *Carr* to *McFarland.* The answer alleges that the mortgage is usurious and therefore void, setting out the particular mode in which usury was taken, and the evidence in the cause on this point was given by witnesses in open court, at the trial below, and was as follows: The defendant *Carr* testified, " the consideration for the note and mortgage, offered in evidence by the plaintiff, was the sum of $16, paid me at the time, I gave the mortgage by *S. Warden* and another note that had been given by me to him Oct. 18,

McFarland vs. Carr et al.

1858, for $296 and interest thereon at 12 per cent. per annum, to Oct. 8, 1859. The note for $296 was due one year from its date and was secured by a mortgage on the same property, covered by the mortgage in suit, which was discharged when the latter was executed, and the balance of the $400, over and above the sum of $296 and $16, was for extra interest on the sum of $400, for the year this note and mortgage had to run. I do not know the plaintiff, never saw him; the consideration for the $296 note was loans of money from said *Warden*, and the first money, I got of him Sept. 29th, 1858. I then owed John Chapple, he at the same time owed *Warden*, and proposed I should pay his debt to *Warden*; I proposed to *Warden* to take up Chapple's note, he consented, and I did so, the amount being $49.58; I paid him five per cent. a month on it, and secured him by a chattel mortgage. On the 18th of October, 1858, I applied to *Warden* for a loan of $125 more, and proposed to put the first loan in with this, and secure the whole by a mortgage on my farm, and this he agreed to; I was to pay him five per cent. a month on the whole amount and it was to run one year, and *this was the only consideration for the $296 mortgage*, which was discharged when the one in suit was given. The balance of the principal sum of the $296 mortgage over and above the $49.58, and interest thereon from Sept. 29, 1858, to October 18, following, and the $125; was interest on those amounts for the year the $296 mortgage was to run, and it drew interest at twelve per cent. besides. Before the $296 mortgage became due, I told *Warden* I should be unable to pay it, and he said he would give me another year at three and a half per cent. per month, and this I agreed to and soon after went to *Warden's* mill to execute the papers. I asked him to read me the mortgage, and he did so, and when he came to *McFarland's* name I asked him why that was there, and he said *McFarland* was the owner of the money, and for that reason he had put his name in the mortgage; this was the first time I had heard of him. I then signed the mortgage and

note, and *Warden* gave me the $296 note and paid me $16 in bank bills, and this is all the money he paid me, and he afterward released the first mortgage.

On cross-examination he testified, that he did not ask *Warden* to procure the money for him of any other person, and that he procured the $125 loan through Mr. Stephens, who witness owed at the time; that Stephens told him he could get the money of *Warden* for 5 per cent. a month, and saw *Warden* for him. *Warden* did not tell defendant that he could get the money for him of a man at the east, and he did not tell *Warden* he would give him $50 to procure a loan of $400.

*S. Warden*, on the part of the plaintiff testified as follows: "In October, 1858, I took a note and mortgage of *Carr* for $296, for various transactions previous to that time; the note was due one year from date, and was to draw 12 per cent. interest, and when it became due I told him he must pay it; he wished me to extend the time for payment; I told him I could not, and he then asked me if I could procure him a loan of $400, and I told him there was a man by the name of *McFarland* in New York, who had sent out a mortgage to me against a man by the name of Champion, in Beloit, for collection; that I had collected it, but the amount was not as much as he wanted, and that I presumed *McFarland* would furnish the balance at 12 per cent.; he said if I would procure such a loan for him he would give me $50; I told him I would write to *McFarland* and tell him about the securities and get a loan for him if I could, and I did write to *McFarland* and gave him a statement of *Carr's* securities and of the loan he desired, and told him it would be a safe investment; he answered that he would take the loan, and sent me a check on Beloit for $70, which, with what I had collected for him amounted to $400, and he instructed me to have the securities made properly and recorded; after receiving *McFarland's* letter I told *Carr* he could have the loan; when the mortgage and note were executed, I handed into *Carr's* hands a package of $400 in bank

bills.  *Carr* took the money, and remarked his hands were so
stiff he could not count it, and asked me to take the money
and count out of it what was coming to me, and asked me the
amount he owed me.  I took out my papers, and computed
the amount due me on my mortgage ; and after computing the
amount so due me on the $296 mortgage, took that amount,
and the $50 which *Carr* was to pay me for the loan, out of the
$400, and paid the balance to *Carr ;* don't remember the bal-
ance paid him."   On cross examination he testified as follows,
to-wit:   " I think the time I had the conversation with   *Carr*
about procuring the loan, was before my mortgage became due.
I wrote to *McFarland* after *Carr* wished me to procure the loan
for him ; when *McFarland* sent the Champion claim to me for
collection, he instructed me to hold the money for a while ; I
have acted as *McFarland's* agent in various transactions, but
never had any discretionary power; I have merely acted under
his directions; he has never remitted me money for the pur-
pose of loaning, except $2,000 in 1856; he has directed me to
make loans for him in this county; I never did so without his
first directing me to do so; I have transacted business for
him ; when the *Carr* mortgage became due it was sent by *Mc-
Farland* to me for collection ; I employed Cuyler to foreclose
it ; I think the balance I paid *Carr* after taking my claim out
of the $400, was about $50 ; the amount I took out of the $400
was $296 and 12 per cent. interest, from October 18th, 1858,
to October 8th, 1859, and the $50 he was to pay me for my
services.

*Allen Warden,* being sworn for the plaintiff, testified as fol-
lows:   "One year ago last fall I was in the mill at Darlington,
owned by Warden & Co.; at the time referred to by *S. Warden,*
saw a package of money handed to *Carr* by *Warden;* heard 300
or 400 dollars spoken of, and supposed the package contained
that amount; *Carr* told *Warden* his hands were so stiff he
could not count it, and asked *S. Warden* to count it, and take
out the amount due him ; *Warden* referred to papers he had in

his hands, and took the money from *Carr*; *Carr* had in his hands all the money which was counted on the occasion; I saw the package of money; I heard $400 spoken of, and supposed the package contained that amount; we frequently had *McFarland's* money in our hands; had some at this time; there was four hundred dollars taken out of our safe at that time. Don't know as there was $400 in the package given by *Warden* to *Carr;* I saw the money pass between them, and heard $400 mentioned; I have no means of knowing that $400 was taken out of our safe at that time; recollect no entries on books to that effect; I did not pay *Carr* any sum myself." This is the substance of all the testimony given on the trial; the circuit court decided that the defense of usury was not sustained, and gave judgment of foreclosure for the amount of the note and mortgage in suit. The defendant *Carr* excepted to the decision and appealed.

*P. A. Orton*, and *J. H. Knowlton*, for appellant.

1. The facts proved constitute usury. *Reed vs. Smith*, 9 Cow., 647; *Crane vs. Hubbell*, 7 Paige, 413; *Barrett vs. Snowden*, 5 Wend., 186; *Collamer vs. Goodrich*, 30 Vt., 628; *Hammond vs. Hopping*, 13 Wend., 505. 2. If *Warden* acted without authority from *McFarland*, a subsequent ratification of his acts is equivalent to a prior authority, Story on agency, § 244, and there can be no stronger ratification of the acts of an agent than the principal availing himself of their benefit. Dunlap's Paley on agency, 172, note O; 15 Pick., 225. Nor can an act be ratified in part and repudiated as to the residue, if ratified in part, the ratification includes the whole. Story on agency, § 250; Dunlap's Paley on Agency, 172.

*C. M. Waring* and *Abbott, Gregory & Pinney*, for respondent. The evidence establishes 1st. That the money loaned to *Carr* was the money of *McFarland* and the only interest *Warden* had in the transaction was, that he was to be paid $50 for obtaining the loan, and the money loaned should be applied so far as necessary, to the payment of his mortgage against

*Carr.*   2. That *McFarland* had no knowledge of the transactions and arrangements as to interest and commissions between *Carr* and *Warden* who was *Carr's* agent.   The burden of the proof is on the appellant to establish usury, and to make the mortgage usurious, it was necessary to show that the transaction was a mere cover for usury.   The taking by *Warden* of a fee or charge for negotiating the loan, without the knowledge or direction of *McFarland*, and in which he had no interest, would not make the transaction usurious.   *Dagnall vs. Wigley*, 11 East 43 ; *Coster vs. Dilworth*, 8 Cow., 299 ; *Crane vs. Hubbell*, 7 Paige 413 ; *Barrett vs. Snowden*, 5 Wend., 181.   And if *Warden* acted as the agent of both parties, the loan would not be usurious, unless *McFarland* knew of, and was to share in the charge for negotiating the loan.   *Baxter vs. Baxter*, 10 Vt., 548 ; *Condit vs. Baldwin*, 21 N. Y. ; *North vs. Sergeant*, 33 Barb., 350 ; *Ketchum vs. Barber*, 4 Hill. 224 ; *Nourse vs. Prime*, 7 Johns Ch., 69.   The evidence being conflicting and having been given by witnesses in open court, the finding of the circuit judge as to the facts of the case, ought not to be disturbed.

*By the Court*, COLE, J.   This is an action to foreclose a mortgage.   The defense is, that the note and mortgage are usurious and void.   This defense the circuit judge thought was not sustained by the evidence.   But upon this point, we have arrived at a different conclusion.   In our opinion, the testimony in respect to the making of the loan, and the giving of the note and mortgage shows that the transaction was usurious. It is true that the evidence in the case is quite conflicting. Indeed it is, on some important points, so certainly and positively contradictory, that it is impossible to reconcile it upon any theory.   But nevertheless the real facts attending the transaction can be sufficiently ascertained to authorize us in saying the loan was usurious.   The appellant *Carr* and one *Satterlee Warden*, who, according to his own statement, acted as agent for the respondent in the negotiation of the loan,

were the principal witnesses at the trial. Their accounts of the arrangement in respect to the loan, differ widely in many important particulars. According to the testimony of *Carr*, the whole arrangement was made with *Warden* who acted for himself and who was the real party in interest, nothing being said about *McFarland* until it came to the execution of the papers, when his name was inserted as the lender, *Warden*, for the first time, saying the money belonged to him. If this statement is true, it would tend strongly to support the theory, that *Warden* was the real lender and that the name of *McFarland* was used to cover the usury. And the previous transactions between *Carr* and *Warden*, in which the latter had exacted and received most unconscionable usury, even five per cent. a month, are somewhat calculated to support the idea that he was the only party who had any interest in the loan, and who was to be benefitted by the usury taken. Indeed nearly one half of the amount of the mortgage in suit, consisted of usury and fees paid to *Warden* upon this and other usurious transactions. But assuming that the loan was made under the circumstances and substantially in the manner stated by *Warden* in his testimony, we think the contract must be presumed usurious. His statements are open to criticism, but we will assume that they are in the main correct. Then, according to his account of the matter, it appears that in October, 1858, he himself took a note and mortgage of *Carr*, upon the very property embraced in the present mortgage, for the sum of $296, due one year from date, with interest at 12 per cent. When the money became due he informed *Carr*, and said it must be paid. *Carr* wished an extension of the time of payment, which was refused. *Carr* then asked *Warden* if he could not procure him a loan of $400, for a year. *Warden* told him that a man in the state of New York, by the name *McFarland*, had sent him a mortgage for collection against a person living in Beloit, which mortgage had been collected, and he was instructed to hold the money a while; that the

amount was not as much as *Carr* wanted, but he presumed *Mc Farland* would furnish the balance at 12 per cent. *Carr* told *Warden* if he would procure such a loan for him that he would pay him, *Warden*, $50. *Warden* said to *Carr* that he would write to *McFarland* and tell him about the securities, and get the loan if he could. He says he did write to *McFarland*, stating what securities would be given, and that the loan would be a safe investment. *McFarland* replied that he would take the loan, and sent *Warden* a check on Beloit for $70, which, with what he already had in his hands, made the amount of $400. He says *McFarland instructed him to have the securities properly executed and recorded.* After the receipt of *McFarland's* letter, *Warden* saw *Carr*, and told him he could have the loan. When *Carr* and wife came to *Warden's* mill to execute the note and mortgage, after the papers were executed, *Warden* says he handed to *Carr* a package of $400 in bank bills. *Carr* took the money, and remarked that his hands were so stiff he could not count it, and asked *Warden* to take the money and count out what was coming to him. Thereupon *Warden* took out the amount due him upon the $296 mortgage, and the $50 which *Carr* agreed to pay him for procuring the loan, and the remainder was paid over to *Carr*. *Warden* said that he had acted as agent for *McFarland* in various transactions in making loans; that he had money placed in his hands for that purpose; that he had no general authority as to making loans, *but always made them under the directions of Mc- Farland.* We do not pretend to give the words of the witness, but this is substantially his statement in respect to making the loan.

Now upon the evidence, the circuit judge thought *Warden* must be considered as the agent of *McFarland* in making the loan. And this was most unquestionably *Warden's* own understanding of his relation to the parties. But the court held that this agency ceased when the $400 was placed in the hands of *Carr*, and that as this money then became his, *Carr* could

dispose of it as he pleased without affecting in any way the contract. So that, according to this view, because *Carr* once received all the money, though he immediately handed the same back to *Warden* to be counted and to have him deduct the amount due him on his mortgage and the $50 *bonus*, yet these subsequent matters could not affect the loan or the rights of *McFarland*. But this, it appears to us, is a most unsatisfactory ground upon which to rest the case. The disguise of paying over the $400, of course with the intention and expectation that *Warden* was to have his *bonus*, can impose upon no one. The real character of the transaction could not be changed by any such shift or device. The real question is, was *Warden*, while negotiating the loan and exacting the payment of the $50 for making it, acting as the agent of *McFarland*, and within the scope of his authority? The circuit judge found that he was acting as the agent of *McFarland* while making the loan. And that he was right in his conclusion is most manifest from *Warden's* own statements, as to his manner of making this and all other loans for *McFarland*. For he expressly says that he had no general authority as to making loans, but *acted under McFarland's directions, and never made loans without first being directed to do so.* If this did not constitute him the agent of *McFarland* for making this loan precisely as he did, it would be difficult to say what would.

It was assumed, in the argument of the case by the counsel for the respondent, and the circuit judge adopts the same view, that *McFarland* had no knowledge of the arrangement by which *Warden* was to receive fifty dollars for making the loan, and that he never assented to this corrupt agreement. This assumption is gratuitous; at all events there is nothing in the case to support it, and the bill of exceptions purports to contain in substance all the testimony given at the trial. We think, however, that the directly contrary inference must arise, and that from the evidence we must presume that he knew of the arrangement. *Warden* says, in effect, that he acted in this

and in all other cases under special instructions from his principal. What those special instructions were in this case, he does not inform us. But if he acted merely under the directions of *McFarland* in making loans, what right have to presume that he departed from those directions in consummating this loan as he did? We cannot assume any such thing. And this feature distinguishes this case from *Condit vs. Baldwin*, 21 N. Y., 219; *North vs. Sergeant*, 33 Barb., 350; *Baxter vs. Baxter*, 10 Vt., 548, and cases of that class. The courts held in those cases that the principal had no knowledge of the secret arrangement entered into between his agent and the borrower, or the latter's agent, in respect to the *bonus* to be paid for making the loan, and sustain the contract on that ground. We certainly do not feel authorized to say that here. On the contrary, we must assume that *Warden*, in making the loan and exacting the payment of fifty dollars, acted as the agent of *McFarland*, and that the latter must be chargeable with all the consequences of his acts. If this was so, no one will contend that the transaction was not usurious. We have already said that it was clear, even from *Warden's* own testimony, that he understood he was acting throughout, in making the loan, as the agent of *McFarland*. He had been in the habit of loaning money for *McFarland*. He evidently considered that he held the $330, which had been collected on the Beloit mortgage, to be loaned in the same way. He knew what *McFarland's* terms were in respect to rate of interest, &c. And in this particular loan, when *McFarland* wrote him that he would accept it, he likewise instructed him to have the securities properly executed and recorded. In all this it appears, that both understood that *Warden* was acting wholly and exclusively as the agent of *McFarland* in negotiating this loan, and was authorized to contract as he did. This would be the fair and natural inference from all the circumstances attending the making of the loan. But when, in addition to this, it appears from *Warden's* own testimony, that he had no general authority for making

loans, but merely acted under directions of his principal, it would seem there was no longer room for doubt in the case. It may be said that he fails to state in so many words that he informed *McFarland* that he was to receive fifty dollars from *Carr*, and that the lender assented to it. It is true that he says generally that he wrote *McFarland* upon the subject of the loan; that *McFarland* accepted the proposition made, &c. The highest legal rate of interest was charged, and also the fifty dollars *bonus*. If *Warden* acted under the directions of his principal, as he says he did, then it is very clear that the latter must be charged with participation in this unlawful profit. We are well aware that there is a class of cases which hold that if a person acts as a broker in behalf of the borrower, and charges a commission for his services in negotiating a loan, without any knowledge or participation of the lender, this does not constitute usury. The doctrine of these cases is not infringed upon or violated here. The agent of the money lender may also be employed to perform services for the borrower, and receive compensation therefor, without rendering the transaction usurious. But there were no services performed here for the borrower. The agent acted throughout for the lender, and did no more than is performed by him in making every loan. The case, therefore, does not fall within the principle of those decisions which allow a brokerage for negotiating loans on behalf of the borrower.

It follows from this, that the judgment of the circuit court must be reversed, and the cause remanded with directions to dismiss the complaint.